KATHRYN C. CURRY (SBN 157099)
TRACY M. TIERNEY (SBN 200537)
GCA LAW PARTNERS LLP
2570 W. El Camino Real, Ste 400
Mountain View, CA  94040
Telephone:     (650) 428-3900
Facsimile:      (650) 428-3901
Email:          kcurry@gcalaw.com
                ttierney@gcalaw.com

Attorneys for Plaintiff DELVIN WILLIAMS

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DELVIN WILLIAMS,<br><br>Plaintiff,<br><br>v.<br><br>BERT BELL/PETE ROZELLE NFL PLAYER RETIREMENT PLAN; THE NFL PLAYER SUPPLEMENTAL DISABILITY PLAN;<br><br>Defendants. | CASE NO.<br><br>COMPLAINT FOR:<br><br>Retirement Benefits Pursuant to The Employment Retirement Income Security Act of 1974 |

Plaintiff DELVIN WILLIAMS ("Plaintiff") alleges on information and belief as follows:

**PARTIES**

1.      Plaintiff Delvin Williams is a former professional football player who played in the National Football League and is a participant in the Bert Bell/Pete Rozelle NFL Player Retirement Plan ("Plan") within the meaning of § 3(7) of ERISA, 29 U.S.C. § 1002(7).

2.      The Plan is an employee benefit plan providing retirement,

**COMPLAINT**

GCA LAW PARTNERS LLP
Mountain View, California

GCA LAW PARTNERS LLP
Mountain View, California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

disability and related benefits to eligible professional football players in the National Football League. The Plan is an "employee benefit plan," within the meaning of § 3(3) of ERISA, 29 U.S.C. § 1002(3), and a pension benefit plan under § 3(2) of ERISA, 29 U.S.C. § 1002(2).

3. Defendant The NFL Payer Supplemental Disability Plan is an employee benefit plan providing retirement, disability and related benefits to eligible professional football players in the National Football League. ("Supplemental Disability Plan.")  The Supplemental Disability Plan is an "employee benefit plan," within the meaning of § 3(3) of ERISA, 29 U.S.C. § 1002(3).

4. The Retirement Board of the Bert Bell/Pete Rozelle NFL Retirement Plan ("Retirement Board") is the named "Plan Administrator" for the Plans within the meaning of Section 3(16)(a), of ERISA, 29 U.S.C. §1002 (16)(a). Members of the Retirement Board individually and the Retirement Board are fiduciaries under the Plans and the "named fiduciaries" under the Plans within the meaning of §§ 3(21)(A) and 402(a) of ERISA, 29 U.S.C. §§ 1002(3)(21)(A) and 1102(a).

## JURISDICTION

5. This case arises under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001, et seq. ("ERISA"), over which this Court possesses original jurisdiction pursuant to 24 U.S.C. § 1132(e) and28U.S.C. § 1131.

6. This Court has personal jurisdiction over Defendants because they transact business in, and have significant contacts within, this District and because ERISA provides for nationwide service of process.  See ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

## VENUE

7. Venue is proper in this district pursuant to ERISA § 502(e)(2), 29

**COMPLAINT**

GCA LAW PARTNERS LLP
Mountain View, California

U.S.C. § 1132(e)(2) for at least one of the following reasons:

    a.    Defendants may be found in this District because they transact business in, and/or have significant contacts with this District, because its participants earned some or all of their pension benefits and receive(d) their pension payments in this District; and/or

    b.    The alleged breaches took place in this District because Plaintiff, who were denied the benefits sought through this action, should have received those benefits in this District.

## FACTUAL ALLEGATIONS

8.    Plaintiff Delvin Williams played eight years in the NFL from 1974 through 1981.

9.    By virtue of his employment with the National Football League, Mr. Williams was participant in the Plans and earned vested rights to benefits under the Plans.

10.    Plaintiff carried the football more than 1,300 times as a starting running back.  He was a two-time all-pro player and the first man to rush for more than 1,000 yards in a single season for teams from both the original AFL and NFL.  He played for the San Francisco 49ers, Miami Dolphins and Green Bay Packers until he was released in October 1981.

11.    While playing in the NFL, Mr. Williams sustained numerous football injuries, multiple fractures, bruises, sprain, strains, tears, and concussions.

12.    In December 1980, while playing for the Dolphins, Mr. Williams sustained a season-ending severe neck injury. The true extent of his injury, however, was never disclosed to him.  Mr. Williams should have been told by the team doctors at that time that he could no longer play football again.

13.     Although he remained on the Dolphins active roster, Mr. Williams did not play in any preseason or regular games in 1981 and was released during the season.  He signed with the Green Bay Packers, but again he did not play in any games and was released in October 1981.  After a cursory examination, the Green Bay Packers' team doctor inexplicably gave Mr. Williams a clean bill of health.

14.     After he was released, Mr. Williams continued to receive payments from the Green Bay Packers through 1984.

15.     As a result of his football related injuries, Mr. Williams was and is permanently disabled and unable to work.

16.     The Plan document, including amendments through March 8, 1983, provided for disability benefits for any player who had not reached his Normal Retirement Date (age under the Plan). Section 5.1 provided that:

> Any Player or Vested Inactive Player, other than a Retired Player or a Player who has reached his Normal Retirement Date, who is determined by the Board upon written application to be totally and permanently disabled, as hereinafter provided for, will be entitled to receive a monthly pension commencing after the expiration of a six (6) month waiting period measured from the date of such disability in an amount equal to 100% of the Benefit Credits of the Player at the date such disability occurs, including if applicable, the scheduled Benefit Credit as provided in Section 4.1 for the Plan Year in which the disability occurs. Such benefits will be retroactive to the date of disability and will be payable for life or until cessation of the total and permanent disability. Effective January 1, 1983, the monthly pension shall be no less than $4,000 if the disability results from a football injury incurred while an active player.

> Effective January 1, 1983, the monthly pension shall be no less than $750 if the total and permanent disability results from other than a football injury ...

17.     Section 5.4 of the Plan document, including amendments through March 8, 1983, provided for normal retirement benefits based on disability as

GCA LAW PARTNERS LLP
Mountain View, California

follows:

> If, as a result of the last physical examination prior to a Player's Normal Retirement Date, the Retirement Board determines that he continues to be totally and permanently disabled, the amount of the monthly pension provided by Section 5.1 shall be payable in lieu of the benefits otherwise payable pursuant to Article 4 as a Form 1 benefit for life if the Player is unmarried on his Normal Retirement Date, or if the Player is married on his Normal Retirement Date, as a Form 2 joint and survivor benefit which is the Actuarial Equivalent of the Form 1 benefit...

### **Mr. Williams Submits a Claim for Disability Benefits in 1982**

18.     Under the Plan, a player may be entitled to a monthly Line of Duty ("LOD") disability benefit if that player incurs a "substantial disablement arising out of NFL football activities." The Plan also provides a separate Total and Permanent ("T &P") disability benefit, which is payable where a former player "has become totally disabled to the extent that he is substantially prevented from or substantially unable to engage in any occupation or employment for remuneration or profit ... and [] that such condition is permanent." A disability is considered "permanent" if "it has persisted or is expected to persist for at least twelve months from the date of its occurrence, excluding any reasonably possible recovery period." A Player may apply for LOD and T &P benefits together or for either benefit separately.

19.     In February 1982, Mr. Williams called the NFL Retirement Plan and asked for and received a disability benefit application. He also called the benefit office on March 7, 1982 to find out how to process his claim for disability benefits. The benefits office told Mr. Williams the NFL Plan would hire a physician to examine him.  He would be notified of the doctor, time, and place of the examination.  After the examination was completed, he was to complete the disability form and return it to the office.

20.     On October 22, 1982, the Plan sent Mr. Williams a letter (along

**COMPLAINT**

GCA LAW PARTNERS LLP
Mountain View, California

with another disability application) notifying him to make an appointment to be examined by Dr. Arthur Holmboe.

**Mr. Williams' Creates NCSM**

21.     After he stopped paying football, Mr. Williams and a former teammate, Larry Schreiber, brainstormed in spring and summer 1982 and came up with the idea to create an organization that would provide training to NFL players to prepare them for life after football.  The training would include drug prevention and education, career planning, and psychosocial issues.  Because they had no ability to turn their idea into a reality, they contacted Byron Kunisawa (a noted program developer, designer, and trainer).

22.     They told Mr. Kunisawa their idea and Mr. Kunisawa created the program and National Sports Career Management was launched.

23.     Mr. Williams pitched the NCSM program to the USFL, which agreed to enter into a one year contract with NCSM for the program developed by Mr. Kunisawa.  Mr. Kunisawa set up the training and implemented the program that was delivered to the USFL.  In order to assist in the operational aspects of the program, Mr. Kunisawa brought in his friend Orle Jackson to run and manage the organization.  Mr. Williams was not involved in running the program.

**The USFL Recruits Mr. Williams to Play for the Oakland Invaders**

24.     In late 1982, Mr. Williams was asked to play football for the newly formed USFL.  He initially declined due to health concerns.  The Oakland Invaders' owner (Ted Taube) and coach (John Ralston), however, continued to pursue Mr. Williams and promised he would not play much and that his role would be to mentor the young players.  He would also do promotional and public relations work for the new team and league.  Moreover, if he agreed to play, he would have a better chance of extending the USFL's contract with NCSM.

**COMPLAINT**

25.   Although Mr. Williams had significant injuries to his hand, toes, shoulder, neck, and knees, he thought he was cleared to play due to the prior (and incorrect) medical clearance from Green Bay.  He also wanted NCSM to succeed so he decided to give it a try and signed a contract with the Oakland Invaders in late November 1982.

### Mr. Williams is Medically Unable to Play Football

26.   Training camp for the Oakland Invaders began on February 1, 1983 in Phoenix, Arizona.  The first few practices were conducted in shorts (not pads) and consisted solely of conditioning drills.  On the first day of practice in pads and during the very first contact drill, Mr. Williams experienced pain in his neck and shoulder.  He also felt tingling and numbness in his shoulder and arms.  His hands and toe also caused significant problems and pain.  Mr. Williams immediately stopped practicing and told the team.  He was held out of practice until he could be examined by the team doctor, Dr. Stuart Zeman.

27.   Dr. Stuart Zeman examined Mr. Williams.  Dr. Zeman also called the Miami Dolphins' team doctor to obtain more information.  The Miami team doctor told Dr. Zeman, Mr. Williams had sustained a serious neck injury while he was playing with the Dolphins in December 1980.  Dr. Zeman ordered an MRI and told Mr. Williams he could no longer play football.  It was the first time anyone had told Mr. Williams about the severity of his neck and shoulder injuries.

28.   Mr. Williams never played football again.  He did not return to practice with the Oakland Invaders and he never played a game in the USFL.

### Mr. Williams Continues to Pursue His Claim for Disability Benefits Under the Plan

29.   Unable to play football or perform other work, Mr. Williams continued to pursue his claim for disability benefits under the Plan.  He was examined by the Plan appointed doctor, Dr. Holmboe, in March 1983, who

- 7 -

**COMPLAINT**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

GCA LAW PARTNERS LLP
Mountain View, California

reported significant disabilities with respect to Mr. Williams' toe and hand.  Dr.
Holmboe noted, but did not address, any other injuries (such as his significant
neck and shoulder injuries) because they were not insured by Fireman's Fund.

30.     After the examination, Mr. Williams completed and returned a
disability claim form to the Plan in 1983.  The application stated he was making a
claim for "T&P disability benefits."  He also wrote on the application that the
disability incurred on: "1974 – 75 – 76 – 77 – 79 – 80."

### Mr. Williams' Claim for Line of Duty Benefits is Denied

31.     Although he had initially applied for T&P benefits, Mr. Williams'
claim was evaluated as a Line-of-Duty claim; and denied.

32.     Mr. Williams appealed.

33.     During the appeal, Mr. Williams was examined by another doctor
chosen by the Plan, Kevin D. Harrington, M.D.  Dr. Harrington also found that
Mr. Williams met the required disability ratings to receive LOD benefits. The
Appeal Board, however, deadlocked on whether to award benefits.  The NFL
player representatives were in favor of awarding benefits while the NFL owner
representatives were against it.  Pursuant to the NFL Plan, the claim then went to
arbitration.  The arbitrator declined to award LOD benefits concluding that Mr.
Williams' injuries had not caused him to stop playing in the NFL since he had
been released.

34.     While the claim was pending, Mr. Williams continued to promote
NCSM, which was being run by Mr. Kunisawa and Mr. Jackson.  Mr. Williams
received no pay or compensation from NCSM.

### Mr. Williams Does Not Work from 1981 through 1986

35.     Aside from his failed attempt to play football for the USFL
Invaders, Mr. Williams did not perform any work from 1982 through 1986.

36.     In 1986, Mr. Williams, along with Larry Schreiber, started Pros for

- 8 -

**COMPLAINT**

Kids, a non-profit charity organization of athletes dedicated to helping kids stay off of drugs.  Orle Jackson developed the Pros for Kids' organizational structure, its programs, helped recruit a board, put together grant applications, create and prepared budget, and operational plans.  With the successful recruitment of a strong board of directors led by Mr. McMasters, who assisted with fundraising, Mr. Jackson and the Board were able to turn Mr. Williams' idea into a reality. Although Mr. Williams was listed as the Executive Director, it was a title only. The organization was run and managed by Orle Jackson, a management team, and the board of directors.  Mr. Williams held the title of Executive Director because he had come up with the idea and he was the "face" of the organization.

37.     Mr. Williams' "work" for Pros for Kids consisted solely of personal appearances at schools, events, and fund raisers to talk about his life and interacting with kids to stay off of drugs.  All paperwork, planning, and management of the organization was performed by others.  Mr. Williams also had an assistant who would transcribe notes, prepare directions, set up appointments and meetings, and writing of letters.  Other than be the face and attend events, Mr. Williams could not do much else because of his physical and cognitive disabilities.

38.     Pros for Kids was successful, teaming up with other groups, politicians (including First Lady Nancy Reagan), sports figures, and community leaders in a united effort to educate kids to say no to drugs.  Unfortunately, Pros for Kids ended around 1990 due to a lack of funding.

39.     After Pros for Kids, Mr. Williams did charitable work for the United Way in 1991.  He would make appearances to talk about his life as an NFL player. He would also mingle and interact with people.  My appearances did not last longer than a few hours a day.  He did not work every day.

**Committee on Jobs Alliance (1991 to 1995)**

**COMPLAINT**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

GCA LAW PARTNERS LLP
Mountain View, California

40.　In 1991, Mr. Williams was asked to use his NFL status and connections within the San Francisco Bay Area community to promote the Committee on Jobs Alliance.  The SF Chamber of Commerce was a major member of the Committee on Jobs.  Mr. Williams was hired by Solem & Associates, who was doing the PR work for the Committee on Jobs.  Mr. Williams' work activities for the Committee of Jobs consisted solely of prearranged meetings with community groups and leaders to discuss how the Committee on Jobs could be of assistance to them.  Mr. Williams would then orally report back what happened during the meetings to Don Solem, who was handling PR for the Committee on Jobs.  Mr. Williams did not prepare any reports or perform any other activities.  He did not meet with people every day and the meetings he had, lasted only an hour or two at most.

41.　Mr. Williams performed the same function for the Committee on Jobs from 1991 through early 1995.  At first, he was paid by Solem & Associates from 1991-1992, but then the SF Chamber of Commerce took over payment of his fees beginning in 1993.  In February 1995, Mr. Williams' contract ended.

### Sports Lab Inc. (April 1995 to June 1995)

42.　For three short months, Mr. Williams tried to work for Sports Lab, Inc., a for profit interactive traveling sports show for kids.  His job duties consisted of using his status as a former NFL player to call and recruit other athletes and community organizers to participate in the traveling show.  Aside from making telephone calls, he did no other activities.  Mr. Williams was required to be in an office all day, which was the first time since football ended that he had such a position.  Mr. Williams tried to make a go of it, but sitting and talking on the phone for more than an hour caused significant pain in his neck and hands.  It was emotionally and physically draining and sapped his stamina.  As a result of the pain, he had to stop working in June 1995 and became

**COMPLAINT**

depressed.

43.     Since June 1995, Mr. Williams has not worked.

### Amendment of Plan and Plaintiff's Claim for T&P Disability Benefits

44.     In or around 1993, unbeknownst to Plaintiff, a federal appellate court held that the interpretation by the Retirement Board, of limiting eligibility for football related disability benefits to only those players who have a single identifiable injury causing the disability, was arbitrary and capricious and violated ERISA. *Brumm v. Bert Bell NFL Retirement Plan*, 995 F.2d 1433 (8th Cir. 1993).

45.     The Plan document, as amended and restated in or around 1995, continued to provide for football and non-football disability benefits. Article 5 of the Plan provides in pertinent part:

> Any Player or Vested Inactive Player, other than a Player who has reached his Normal Retirement Date or begun receiving his monthly pension under Article 4, who is determined by the Board upon written application to be totally and permanently disabled will receive a monthly total and permanent disability benefit commencing after the expiration of a six- month waiting period measured from the date of such total and permanent disability in an amount equal to the sum of the Benefit Credits of the Player at the date such total and permanent disability occurs, including, if applicable, the scheduled Benefit Credit as provided in Section 1.10(c)(2) for the Plan Year in which such total and permanent disability occurs. This benefit may be increased as provided below.
>
> Notwithstanding the above, all benefits provided by this Article will be retroactive to the later of (a) the first month following the date of the total and permanent disability or (b) July 1, 1993, and will be payable for life until cessation of such total and permanent disability.
>
> ...
> (a) Active Football. The monthly [T P] benefit will be no less than $4,000 if the disability(ies) results from [NFL] football activities, arises while the Player is an Active Player, and causes the Player to be totally and permanently disabled `shortly after' the disability(ies) first arises.

**COMPLAINT**

GCA LAW PARTNERS LLP
Mountain View, California

\* \* \*

(c) Football Degenerative. The monthly total and permanent disability benefit will be no less than $4,000 if the disability(ies) results out of League football activities, and results in total and permanent disability before the later of(a) age 45 or (2) 12 years after the end of the Player's last Credited Season. (d) (Inactive). The monthly total and permanent disability benefit will be no less than $1,500 if(1) the total and permanent disability arises from other than League football activities while the Player is a Vested Inactive Player, or (2) the disability(ies) arises out of League football activities and results in total and permanent disability after the later of (i) age 45 or (ii) 12 years after the end of the Player's last Credited Season.

46.   In addition to disability benefits available prior to normal retirement age, the Plan also provides for Retirement Benefits, including retirement benefits for those persons reaching Normal Retirement Date having been disabled prior thereto. Section 5.4 of the Plan provides:

Retirement on Disability. If, as a result of the last physical examination prior to a Player's Normal Retirement Date, the Retirement Board determines that the Player continues to be totally and permanently disabled, he will be entitled to a monthly pension under Article 4, with his total and permanent disability benefit under Section 5.1(a), 5.1(b), 5.1(c) or 5.1(d), whichever previously applied, substituted for the sum of his Benefit Credits for life or until cessation of such total and permanent disability ...Section 4.4 will govern the form in which benefits are paid and may provide for an actuarial reduction in benefits in accordance with the rules of that Section.

47.   In addition to the Retirement Plan, the Supplemental Disability Plan, which was established in or around 1993 provides supplemental disability benefits for "Eligible Players." The 1995 Plan document defines an "Eligible Player is defined as "any Player who is receiving total and permanent disability benefits under Sections 5. 1(a) (Active Football), 5.1 (b) (Active Non-Football), or 5.1 (c) (Football Degenerative) of the Bert Bell/Pete Rozelle Plan (including the continuation of the above benefits pursuant to Section 5.4 of the Bert Bell/Pete

**COMPLAINT**

GCA LAW PARTNERS LLP
Mountain View, California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Rozelle Plan)." The 1995 Plan document provides that Football Degenerative disabled players shall receive $2,250 effective July 1, 1993, with scheduled periodic increases from time to time.

48.     In or around 1995, Plaintiff received a new Summary Plan Description setting forth four new categories of disability benefits.

49.     Because the Plan had been amended, Mr. Williams submitted a claim for T&P disability benefits with the NFL in 1995.  In support of the application, Mr. Williams submitted a Physician's Report completed by the prior neutral examiner, Dr. Harrington, who found that Mr. Williams did not have the capacity to work because of the injuries he had sustained during his NFL career.

50.     On October 23, 1995, the Plan approved the claim for disability benefits and awarded Mr. Williams "Football Degenerative" benefits.  The Plan "instructed the advisors to recommend an effective date" for the award.

51.     Disabilities were classified under the Plan as "football degenerative" if the "disability(ies) arises out of League football activities, and results in total and permanent disability before the later of (1) age 45, or (2) 12 years after the end of the Player's last Credited Season."

52.     Mr. Williams also received a letter advising he was entitled to additional disability under the new NFL Player Supplemental Disability Plan.

53.     The active football and degenerative football classification paid the same monthly benefit -- $4,000 a month at the time benefits were awards.

54.     Because the benefits were the same, Mr. Williams did not challenge the Plan's classification of his injury as "football degenerative."

**<u>Request for Retroactive Disability Benefits to July 1993</u>**

55.     In the letter accepting his claim for benefits, the NFL Plan asked Mr. Williams to submit information if he wanted to receive benefits prior to May 11, 1995, which he did.  Mr. Williams, through his attorneys, submitted the

GCA LAW PARTNERS LLP
Mountain View, California

requested information asking for benefits to be paid from July 1993, the date the disability plan was amended.

56.     The request for retroactive benefits to July 1993 was denied even though the NFL Plan's doctor had determined that Mr. Delvin had been disabled and unable to work in any reasonable capacity since 1984. The Plan had concluded Mr. Williams was not disabled before 1995, simply because he had earned income from various organizations from 1986 to 1995. The Plan did not investigation as to the nature of the earnings.

57.     Mr. Williams filed a lawsuit in court challenging the Plan's decision. The Plan's decision was initially reversed by the district court, but the Ninth Circuit affirmed the NFL Plan's decision on the basis the Retirement Board had not abused its discretion.

### Post 1995 Medical Treatment and Surgeries

58.     Since he left the NFL, Mr. Williams has been under the constant medical care of doctors.

59.     In 1996, he underwent testing for his various cognitive problems and was diagnosed with ADHD and dyslexia at that time.

60.     In 2001, Mr. Williams began undergoing surgeries for his NFL injuries.  Since then he has had 15 surgeries, all of which had lengthy recovery times.

61.     In or around 2007, Mr. Williams began experiencing noticeable memory and cognitive problems.  His physician referred him for further testing and he was diagnosed with CTE most likely caused by the numerous hits he sustained during the NFL, including a severe concussion he suffered while playing with the Dolphins.

### The Plan Unilaterally Reclassifies Mr. Williams Disability Benefits as Inactive A Benefits

62.     In late 2011, the Plan was amended again and Mr. Williams was

- 14 -

notified his disability benefits had increased.  He was sent various election forms, which he completed.

63.   Under the amended Plan, the Football Degenerative classification was eliminated and his disability was unilaterally reclassified by the Plan as Inactive A.  Whereas Football Degenerative benefits and Active benefits had been the same amount, Inactive A benefits were now significantly less than Active A benefits.

64.   Mr. Williams also became eligible for a legacy benefit.

65.   At age 67, the Plan first notified Mr. Williams that his disability benefit was now characterized as a retirement benefit since he turned 65.  It was incredibly confusing to him.  At the same time, he was dealing with various surgeries and my physical and mental capabilities were declining.

66.   In early 2018, Mr. Williams sent several emails to the Plan trying to understand what his benefits were and how they were calculated.  He felt he was not receiving all of the benefits he was entitled to under the various plans.  The communications back and forth were confusing and he could not understand what was being explained to him.

67.   After receiving notice of the amended and restated Disability and Neurocognitive Benefit Plan, Mr. Williams believed he might qualify for benefits under that new plan because of his CTE diagnosis and other documented neurocognitive problems. He submitted a claim for benefits under that new Plan. and also requested that his disability benefits be reclassified as Active rather than Inactive A.

68.   The requests were denied by letter dated March 22, 2018.

69.   Mr. Williams timely appealed the denial on September 19, 2018.

70.   The Plan upheld the denial on November 12, 2018.

/ /

COMPLAINT

**FIRST CAUSE OF ACTION**
**(Recovery of Plan Benefits [29 U.S.C. § 1132(a)(1)(B)])**
**(Against All Defendants)**

71.    Plaintiff repeats, realleges, and incorporates by reference herein each and every allegation contained in paragraphs 1 through 70 of this Complaint.

72.    This is a claim to recover benefits, enforce rights, and/or clarify rights to benefits under ERISA pursuant to 29 USC § 1132(a)(1)(B).

73.    The Plans constitute an "employee benefit plan" within the meaning of 29 USC § 1002, et. seq., as an employee pension benefit plan - providing for the payment of disability/retirement income benefits.

74.    At all times material to this action, Mr. Williams was a vested participant in the NFL Plan within meaning of 29 USC § 1002, et. seq.

75.    Mr. Williams has satisfied all conditions precedent necessary to prosecute this action, including exhausting his administrative remedies.

76.    Defendants failed to pay benefits to which Mr. Williams is entitled under the terms of the NFL Plan, in contravention of ERISA and the terms of the NFL Plan.

77.    Defendants' refusal to pay Mr. Williams's claim violates the terms of the Plans and applicable law.  Defendants are liable for all benefits due under the NFL Plan that have been improperly withheld from Mr. Williams.

78.    As a proximate result of Defendants' actions, Mr. Williams has been deprived of benefits to which he was entitled.

79.    Pursuant to 29 USC § 1132(a)(1)(B), Mr. Williams, as a participant in the NFL Plan, is entitled to sue for a judicial determination and enforcement of his rights.  He is also entitled to interest and recovery of attorneys' fees.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants, and each

- 16 -

**COMPLAINT**

of them, as follows:

1.  A judicial declaration that Plaintiff is entitled to Active A benefits as a under the Plans;

2.  An award of benefits to Plaintiff under the Plans;

3.  An Order awarding interest on unpaid benefits;

4.  An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

5.  An order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g); and

6.  For such other and further relief as this Court may deem just and proper.

Dated: July 23, 2019                        GCA LAW PARTNERS LLP

                                            By:  /s/ Kathryn C. Curry
                                            KATHRYN C. CURRY
                                            TRACY M. TIERNEY
                                            Attorneys for Plaintiff
                                            DELVIN WILLIAMS

GCA LAW PARTNERS LLP
Mountain View, California

- 17 -
**COMPLAINT**